IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

---------------------------------

ELENA SALINAS,

        Plaintiff,

   -vs-

VALLEY COUNTY SHERIFF'S DEPARTMENT
of GLASGOW, MONTANA, a Political Subdivision;
LUKE STROMMEN; and JOHN DOES 1-3,

        Defendants.

---------------------------------

CASE NO. CV-19-90-GF-BMM

DEPOSITION OF ELENA SALINAS

                      VIA ZOOM
                      February 7, 2022
                      8:32 a.m. - 11:55 a.m.

**EXHIBIT**

**B**

```
 1         A    Correct.
 2         Q    Have you ever filed a lawsuit like that in
 3    any kind of court or administrative proceeding before
 4    that has your name on it?
 5         A    I don't know if it's a lawsuit, but I did
 6    try to go after my former career, so.
 7         Q    When you say your former career, what do you
 8    mean by that?
 9         A    Homeland Security.  It was like an EEOC type
10    thing.
11         Q    Okay.  Did you work for Homeland Security at
12    one point?
13         A    Yes.
14         Q    And what time period did you work for
15    Homeland Security?
16         A    Oh, God, 16 plus years, and I don't remember
17    what year.  2003 I belive to 2019.
18         Q    Okay.  And as a former employee of Homeland
19    Security, you filed a legal action against them?
20         A    Yep, yep.
21         Q    Okay.  What was the nature of the legal
22    action?
23         A    To get reinstated back.
24         Q    Okay.  Were you terminated from your
25    position?
```

1          A    No.

2          Q    Did you resign from your position?

3          A    Yes, uh-huh.

4          Q    Okay.  And is that proceeding ongoing right

5     now?

6          A    Yes.  But we're kind of like waiting for the

7     next step, but it's going to take a while.

8          Q    Are you represented by counsel in that

9     matter?

10          A    Yes.

11          Q    And who is your counsel?

12          A    Adam Casner, C-A-S-N-E-R.

13          Q    And where is Mr. Casner from?

14          A    Texas.

15          Q    Is that the location of the litigation?

16          A    Yeah, it was Houston.  I think his office is

17     out of Houston now.

18          Q    And what are the allegations that you are

19     making in that action against Homeland Security?

20          A    Forced resignation.

21          Q    When did you resign?

22          A    October 2019.

23          Q    And are you alleging that you were the

24     subject of a hostile work environment?

25          A    Yes.

1    investigations?

2         A    Basically they weren't good because I didn't

3    get my job back, and so I'm just waiting.

4         Q    Well, in terms of the determination of the

5    merits of your claim, did they find that your

6    allegations were founded or did they deny that the

7    allegations were supported?

8         A    I would go with the latter.

9         Q    Okay.  So they disagreed with your

10   allegations; correct?

11        A    (Witness nods head.)

12        Q    Correct?

13        A    Correct.

14        Q    Okay.  Just for the purposes of our court

15   reporter, I need to make sure we have an audible

16   response, okay.  It's hard.  So I'm just trying to

17   make sure that our record is complete, okay?

18        A    Oh, I get it.

19        Q    Okay.  And so the investigation found

20   against you, and you are in the process of appeal.

21   Am I understanding that correctly then?

22        A    Uh-huh.

23        Q    Okay.  Who was the person who was sabotaging

24   your paperwork?

25        A    Coworkers.

1      Q    Was there more than one?

2      A    There's no link to who it would be.  It's
3    like a generic kind of work environment where there's
4    no connection to who is touching what.

5      Q    Okay.

6      A    But, yeah, it was a lot of times it was
7    happening more frequently than once.

8      Q    It's your contention that your coworkers
9    were going in and changing your official reports?

10     A    Uh-huh, getting rid of them.  Kind of making
11   it look like I was incompetent.

12     Q    And what would be the purpose of that?  Why
13   would they do that?

14     A    To make me look incompetent.

15     Q    Did you identify any particular coworkers
16   that you believed were doing the sabotaging?

17     A    I think I did.  I don't think so.  I'm
18   not -- it's been over a couple of years.

19     Q    Okay.  You also mentioned someone about
20   harassing you?

21     A    That was at the other court in Montana
22   before I moved.

23     Q    Okay.

24     A    She had a connection with somebody that
25   worked in Houston when I got there, and I had no

```
 1    idea.
 2         Q     Okay.  And who is she?
 3         A     Lisa Cintron.
 4         Q     And was Lisa a coworker of yours?
 5         A     She was a boss.
 6         Q     She was your boss.  Was she a direct
 7    supervisor?
 8         A     Yes.
 9         Q     Did you file a complaint with your employer
10    about Lisa?
11         A     Yes.
12         Q     And when did you file that complaint?
13         A     I can't tell you.  It was when I was in
14    Opheim, when I was in Opheim.
15         Q     Okay.  Was it sometime in the period of 2013
16    to 2018?
17         A     It would have been.  Not 2013, that's really
18    early.  Before 2018 I believe.
19         Q     Okay.  And what was the nature of your
20    complaint against Lisa Cintron?  Was it harassment?
21         A     Well, she was a narcissistic person.  She
22    was overstepping boundaries.  She called me in a
23    drunken stupor.  She was threatening another officer.
24         Q     She was threatening another officer?
25         A     Threatening to sabotage another officer.
```

1   Q   And who was that?

2   A   Neil, I'm trying to think of the last name,

3   Neil Holland, H-O-L-L-A-N-D.

4   Q   And so you filed a complaint against Lisa --

5   A   Uh-huh.

6   Q   -- right?

7   A   Well, I reported it to upper management.

8   Q   And who did you report it to?

9   A   To, it would be the port director of Port of

10   Raymond.

11   Q   Would that be Randy Lasar?

12   A   Yep, Lasar.

13   Q   L-A-S-A-R?

14   A   Yes.

15   Q   And what did Mr. Lasar do?

16   A   Pretty much nothing.

17   Q   Okay.  Again was your complaint

18   investigated?

19   A   They say it was.  But in the government and

20   things like that kind of are not.

21   Q   Okay.  And your contention that they did not

22   do an adequate investigation; right?

23   A   Yeah.  And she wasn't even supposed to be a

24   supervisor.  She never even went through the proper

25   protocol and chain of command to get to the

```
 1    supervisor position.   They just filled it as a favor,
 2    I had heard.
 3         Q    And so would it be fair to say that they
 4    declined or disregarded or did not believe your
 5    allegations?
 6         A    Randy Lasar, I don't think so.  He told me
 7    to turn the other cheek and ignore it.
 8         Q    Okay.  Did you file an appeal?
 9         A    No.  I just thought to myself, when all of
10    that was happening, I was going through the whole
11    motions and fighting the complaint, and it got to the
12    point where I guess I had either to go to court or
13    not.  And it was going to cost a lot of money, and I
14    was going to have to pay for my own attorney.  And I
15    didn't know that management has their own attorney
16    through the government, so they don't have to pay for
17    anything at all.  And I knew I was going to get
18    drained.  And I just thought, you know what, it's not
19    even worth it.
20         Q    What was the nature of your complaint
21    against her?  Was it -- were you alleging that she
22    was doing something to you, or that she was just
23    doing something improper?
24         A    I would say both.
25         Q    Okay.  Was it a discrimination claim?  Was
```

1    don't think so.

2         Q    And am I understanding correctly then that

3    the complaint was denied and that you chose not to

4    pursue it any further in court?

5         A    I don't think it was denied.  It was just

6    that I didn't want to pursue it because I didn't want

7    to drain out my bank account.

8         Q    Okay.  Was there any kind of determination

9    based upon the merits rendered?

10        A    I can't tell you.

11        Q    Okay.  Well, we have the hostile work

12   environment against your Homeland Security that is

13   pending.  We have the complaint against Lisa Cintron;

14   right?

15        A    C-I-N-T-R-O-N.

16        Q    C-I-N-T-R-O-N, thank you.

17        A    And the customs one was late 2019.

18        Q    Okay.  Any other, any other claims,

19   complaints, legal actions that you've been involved

20   in?

21        A    Like anywhere?

22        Q    Anywhere.

23        A    Like Workman's Comp or --

24        Q    No.  I don't want to hear about any workers'

25   comp, but any kind of personal injury, any employment

1    related, any legal claims that you have filed on your

2    behalf.

3         A    I just filed the ones for Anthony Roberts

4    and Lisa Cintron when I was in Opheim.

5         Q    Okay.  Let's talk about Anthony Roberts.

6    What did you file against Mr. Roberts?

7         A    I reported it to Randy Lasar at the Port of

8    Raymond, his behavior at the port.

9         Q    Was Mr. Roberts a co-employee of yours?

10        A    Yep.  I knew him at that time over ten

11   years, but only worked with him pretty much at work.

12        Q    Okay.

13        A    And mostly it was just over the phone

14   because he had work in different locations.

15        Q    And this was at the Opheim?

16        A    Yep.  He transferred there as his retiring

17   port.  So he transferred to my location.

18        Q    Okay.  Do you believe that he transferred to

19   your location because of you?

20        A    No.

21        Q    Okay.  All right.

22        A    He wanted to get back to the area, and he

23   transferred there to pretty much have an easy

24   retirement port.

25        Q    Okay.  And what did you report, or what did

```
 1        you file a complaint about?
 2              A     Well, when he came to the port, he thought
 3        that he had an agenda.   And instead of him coming to
 4        the port and being a good coworker and saying he was
 5        going to help me out and, you know, stick with me and
 6        support me and all of that kind of stuff as a
 7        coworker, instead he thought that I was supposed to
 8        date him.
 9              Q     So he was romantically interested in you?
10              A     I guess.
11              Q     And was that mutual?
12              A     He was a pain.
13              Q     Were you romantically involved with him?
14              A     Him and I, we kissed, and he liked me.   But
15        I was trying to just keep him away from me pretty
16        much.   He was very annoying, wanting to have sex with
17        me.   He would tell me if you don't have sex with me,
18        you're a lesbian, you're an idiot, there must be
19        something wrong with you because you don't want to
20        have sex with me.
21              Q     Did you have a relationship with him?
22              A     No.   We had a friendship relationship.   We
23        were just friends.
24              Q     Okay.
25              A     He wanted a relationship.   I didn't.
```

1      Q    Did you date at all?

2      A    No.

3      Q    Okay.  So are you saying that there was one

4    sexual encounter that you had with him or was there

5    more?

6      A    Well, kissing --

7           MR. COOK:  I think you're mis-describing

8    what she testified to.  She's saying she kissed him

9    once.

10          MR. KROGH:  Okay.

11          MR. COOK:  I wouldn't classify that as a

12   sexual encounter.

13     Q    (BY MR. KROGH)  Well, did you kiss him more

14   than once?

15     A    Yes.

16     Q    And how many times?

17     A    It was one time at his house.  And we lived

18   next door to each other.

19     Q    Was there more than one time?

20     A    Yes, we kissed twice.

21     Q    Okay.  But beyond that there was no other

22   sexual relationship or romantic relationship between

23   the two of you?

24     A    I was at his house.  He kissed me.  I kissed

25   him, and I think we ate or whatever.  And we kissed

1        A     Yes, they filed it.

2        Q     Okay.  And what became of that?

3        A     I think they pulled him, and he had to go to

4    I think the Port of Raymond.  He was working for

5    them, and he was going back and forth.  So when we

6    would -- when we worked together, I would come in.

7    And if it was the same time, I would wait for him to

8    go to work and then leave.  And then I would go to

9    work.  So we wouldn't see each other.  So they were

10   keeping him separated from me.

11       Q     Okay.  Was there anything, I mean was there

12   an administrative proceeding?  Was there an

13   investigation?  Was there any discipline issued to

14   him?

15       A     I don't even know like really.

16       Q     Did they agree or find that your allegations

17   were true?

18       A     I just turned everything in.  They did all

19   that.  And then I went to Valley County and filed a

20   no contact.

21       Q     You filed a restraining order?

22       A     No, they don't have that.  So it's a

23   no-contact thing, no talk, no text.  And I filed

24   that, that way he would leave me alone because when I

25   was at my house, he would -- if I went outside to the

 1     backyard, he would go outside to his backyard.  If I
 2     went outside, he would open a window.  It was
 3     constant.
 4          Q    Okay.  So you had a no-contact order against
 5     Anthony?
 6          A    Correct.
 7          Q    Okay.  Has anyone ever gotten a no-contact
 8     order against you?
 9          A    He did.
10          Q    Okay.  Anyone else?
11          A    No.
12          Q    Any other restraining orders, injunctions,
13     orders of protection that either you have filed or
14     sought against someone or someone has sought against
15     you?
16          A    No, I don't think so.
17          Q    Was Mr. Roberts, did he continue to work
18     there as long as you worked there?
19          A    Oh, yes.
20          Q    Okay.  Was there any change in his position
21     because of your complaint?
22          A    No, no.  He was violent at work sometimes
23     with other people.
24          Q    Was there any employment decision based upon
25     your complaint that was detrimental to you, meaning

1    did your employer say that they did not believe your

2    allegations?

3        A    No, they didn't say that.

4        Q    Okay.

5        A    I don't know.  I think that they, one of the

6    supervisors told me that they didn't really know what

7    to do with that situation.  They have never

8    encountered something like that that they know of.

9        Q    Any other complaints against coworkers that

10   you've filed?

11       A    Yes.

12       Q    Let's talk about them.  What is the next

13   one?

14       A    Formal, informal, anything?

15       Q    Yep.  Any complaints that you've had against

16   people that you've worked with.

17       A    Let me see if I can remember.  There was Ted

18   Jones would be Scobey, Montana.

19       Q    Who is Ted Jones?

20       A    He died.  He was a port director.

21       Q    And you filed a complaint against him?

22       A    He was abusive to an officer and verbally

23   abusive to us.

24       Q    What do you mean abusive to an officer, in

25   what way?

1          A    Grabbed ahold of an officer's arm and tried
2     to break it in front of me.
3          Q    And you filed a complaint against Ted?
4          A    I remember talking to someone in upper
5     management and let them know what was going on.
6          Q    Okay.  And what was the result of your
7     complaint?
8          A    Back then I was new, so nothing.  I was a
9     newbie, so they didn't care.
10          Q    So they did not --
11          A    No.
12          Q    They did not find that your allegations were
13     founded?
14          A    That's not true.  They didn't say anything
15     to me that they were not founded.  They just didn't
16     give a damn.  They didn't respond.
17          Q    Okay.
18          A    That's how the government works.
19          Q    Okay.  Anyone else that you made a complaint
20     against?
21          A    I'm trying to think where my next port was
22     at.  In North Dakota, I'm trying to think of his
23     name.  It was a port director.  He went out to the
24     public, and he was a talker.  And he went out there
25     and started telling them who I voted for and who I

1    didn't vote for, and what an idiot I was, and some

2    other stuff like that.  And then somebody came into

3    the port, and he was talking about, to the person,

4    that I probably have crusty underwear.

5         Q    And who was the person that he talked to?

6         A    It was a Canadian, a person coming to the

7    port.

8         Q    And did you -- and this was the port

9    director in North Dakota?

10        A    Yep.  His name was Kevin Ryan.

11        Q    Kevin?

12        A    Ryan, yep.

13        Q    Ryan?

14        A    Uh-huh.

15        Q    R-Y-A-N?

16        A    Yep.

17        Q    Is he still the port director there?

18        A    No.  After I had submitted lots of evidence

19   and he also called my home, left a nasty message on

20   my answering machine, told me that some stupid broad,

21   some blond bimbo called me at work, and left it on my

22   answering machine.  And I took the tape, I sent it to

23   internal affairs.  He also told me that I was -- I

24   had three things wrong with me:  I was Mexican, I was

25   female, and my age, that people weren't going to

```
 1      respect me.  I turned all that in.
 2           Q    You turned it in to internal affairs?
 3           A    Yep.
 4           Q    And what was the result of your complaint?
 5           A    Internal affairs gathered more information
 6      from other people.  They submitted documents to
 7      internal affairs, including the Canadian
 8      counterparts.  I didn't know they talked to them.
 9      They also submitted on my behalf.  And when internal
10      affairs came out to speak to him, this is what I
11      heard, he ran.
12           Q    He ran?
13           A    So, yeah, he quit.
14           Q    Oh, he resigned?
15           A    He left.
16           Q    Okay.  All right.  Any other complaints?
17           A    Houston we talked about.  That was the last
18      one in Houston.  There was in California.  I can't
19      remember his name.  It was misuse of government
20      equipment.  José was his first name.  I don't
21      remember his last name.  Oh, female from Mexicana
22      Airlines.
23           Q    Let's go back to José here and misuse of
24      government equipment, tell me about that.
25           A    When the people get off the airplane, they
```

```
1    for misuse of government equipment for using a
2    vehicle lift?
3         A    Yes.
4         Q    And who was that?
5         A    Dewey Tarver.
6         Q    Say that again?
7         A    Dewey Tarver, T-A-R-V-E-R.
8         Q    And when was that?
9         A    Well, that was at Opheim, but I can't really
10   tell you the year.  Maybe 2016, 2018.
11        Q    And was Dewey trying to fix your vehicle by
12   using government, a government lift?
13        A    No.  He was fixing his vehicle when I
14   reported that.  He was doing an oil change.
15        Q    Okay.  And you reported him for misusing
16   government property for his own personal use?
17        A    He wasn't supposed to use that.  We're not
18   supposed to.
19        Q    And it didn't have anything to do with your
20   vehicle at all?
21        A    One time my vehicle was over there, and we
22   parked there, and we lived like 50 feet away.
23        Q    Okay.
24        A    And I had a leak under my vehicle, and he
25   said he would check it out.  He would look underneath
```

```
 1      there because something was leaking.
 2          Q    And he used the government lift to do so;
 3      right?
 4          A    I didn't ask him to, nothing like that.  So
 5      I can't recollect if I even saw it on the lift or
 6      anything like that, but --
 7          Q    So you came to know that he used the
 8      equipment to look at your vehicle; right?
 9          A    Correct.
10          Q    Yeah.  You didn't report him for that,
11      though, did you?
12          A    Well, he reminded me about that.
13          Q    Okay.  You didn't report him for using
14      government equipment when he used it for your
15      benefit; right?
16          A    I didn't even think about it at all.
17          Q    My question is you didn't report it; right?
18          A    No, I did not.
19          Q    Okay.  Did you ever make an accusation
20      against a banker in Scobey?  Did you make an
21      accusation about anybody in Scobey about
22      inappropriate conduct?
23          A    I don't know about a banker.
24          Q    Okay.
25          A    If you can give me a name or --
```

1     Q     Where are you currently living?

2     A     Columbus.

3     Q     Columbus, North Dakota?

4     A     North Dakota.

5     Q     I actually know where that's at.

6     A     Oh, wow.

7     Q     Are you living with anyone right now?

8     A     My cats.

9     Q     Okay.  Tell me about your education,

10    starting with like high school.  Did you go to high

11    school?

12    A     Yep.

13    Q     Okay.  Where did you go to high school at?

14    A     Highlands in San Antonio.

15    Q     Did you finish high school?

16    A     Yes.

17    Q     Okay.  Did you get a diploma?

18    A     Yes.

19    Q     Okay.  Did you go on to any other higher

20    education?

21    A     Yep.  I went on to graduate, and I got my

22    bachelor's degree in bachelor of arts from UTSA in

23    San Antonio.

24    Q     Okay.  Anything further?

25    A     No.

1        Q    Okay.

2        A    Because, frankly, I don't really know what

3    is going on in 2014.  But I know that we had a major,

4    major cyber security issue that went on.

5        Q    Well, I don't believe there's another call

6    regarding that matter.  So can we assume then that

7    you were fine with Valley County not prosecuting

8    or --

9        A    Oh, yeah.

10        Q    -- conducting any kind of investigation?

11        A    Oh, yeah.  I would have followed up if there

12    was something, uh-huh.

13        Q    Okay.  The next one I'm going to mark as 23.

14            (Deposition Exhibit Number 23 marked for

15    identification.)

16        Q    And this is a call made by you, and it is

17    December 21st, 2014.  And it's from the port of entry

18    in Opheim, and it says, "Reporter called to report

19    that she's being stalked by a former employee of

20    CBP," which is --

21        A    That was Mark Tronuer, that was the Mark guy

22    from Minneapolis or Twin City.

23        Q    And this is Mark Tronuer?

24        A    Uh-huh.

25        Q    Okay.  And you were making a call or a

1       complaint against him; right?

2           A    Yeah, so they can look into like how that

3       happened or how he hacked into my computer.

4           Q    And you understood there was an

5       investigation going on; right?

6           A    Uh-huh.

7           Q    Right.  Did anything ever come of that

8       investigation, do you know?

9           A    No, I never heard back.

10          Q    Okay.  Mark this as 24.

11               (Deposition Exhibit Number 24 marked for

12      identification.)

13          Q    This is a --

14               For the record, Katie, we are, sorry, we're

15      at Valley County 600 all the way back to 597.  So 597

16      through 600, sorry.  And for 23 is Valley County 605.

17      22 is Valley County 607.

18               So on Number 24, which is Valley County 597

19      through 600, again, you were the reporter.  It was

20      July 3rd, 2016.  And based upon the description, you

21      would like to speak with a deputy regarding someone

22      harassing, intimidating, threatening, contacting you

23      and retaliating against you.  You said that the

24      subject is your boss, who lives two houses away from

25      you in the cul-de-sac.  Do you remember that?

```
 1        Q    Tell me when you first met Luke Strommen.

 2        A    When he came out to my house when I was

 3   complaining about Mark Tronuer.

 4        Q    So December of 2014?

 5        A    (Witness nods head.)

 6        Q    We know that you made that call; right?

 7        A    Yes.

 8        Q    December 21st of 2014, which was Deposition

 9   Exhibit 23; right, Valley County 605?

10        A    Correct.

11        Q    Just for purposes of kind of orientating you

12   to date.

13        A    Yes.

14        Q    So you called December 21st, reported it,

15   and Mr. Strommen then came out sometime later to

16   follow up; is that right?

17        A    Correct.

18        Q    And that was the first time that you had met

19   him?

20        A    Uh-huh, yes.

21        Q    Had you known him before or knew of him?

22        A    No.

23        Q    Okay.  Tell me about that meeting.  What

24   happened?

25        A    Is there anyway that you can ask questions?
```

1      Q    Well, what do you recall of that meeting?

2      A    He came to my house.  We talked about the

3  case.  I told him what happened.  I think he had to

4  bring a document.  I'm not sure if I had to bring a

5  document out.  I think it was that day that he came

6  out.

7      Q    Did you call him to come out, or did he call

8  you?

9      A    When I called them, I just made the report.

10  And then I'm not sure if they called me.  I guess

11  they just called me back.  I don't know who called me

12  back, but they said somebody is going to come out.

13      Q    Somebody had called you from Valley County

14  and said that Luke Strommen was on his way; is that

15  what you're testifying to?

16      A    If that's what happened, that's what

17  happened.  I don't really remember.

18      Q    Well, that's what I'm trying to get to.

19      A    Yeah, I don't remember if I -- I didn't call

20  to specify anybody to come out, a specific person to

21  come out, nothing.  So I don't know if they called

22  and said that they're on their way or when they

23  talked to me, the formal complaint, they wanted to

24  talk to somebody, if they told me that he was coming

25  out.  So I don't really know.

1        Q    So, Ms. Salinas, sitting here today, you

2    don't have any recollection, other than Deputy Luke

3    Strommen came out to see you; right?

4        A    Uh-huh.

5        Q    You met with him.  You talked about the

6    case.  You believe that he had a statement for you or

7    did -- had you provided a statement to the Valley

8    County Sheriff's Department before that?

9        A    I'm not sure if I wrote one, or I didn't get

10   a copy of it or whatever.  I'm not sure if I wrote

11   one and had it ready, or if they were going to bring

12   me some form I think and I'm supposed to work on that

13   form.  I'm not sure.

14       Q    So best of your recollection is that Luke

15   then dropped off a form for you to fill out, which

16   would have been a statement regarding your complaint

17   against Mark Tranior; right?

18       A    Uh-huh.

19       Q    Anything else that you recall at that

20   meeting?

21       A    He was flirtatious and savvy, pardon me, and

22   told me that -- I can't say verbatim -- that he could

23   just climb over the bar or the table or whatever and

24   kiss me or something like that.

25       Q    Where were you at when you had this

1   conversation with him?

2        A    At the island in my kitchen.

3        Q    Were you standing on one side of the island

4   and he on the other?

5        A    Correct.

6        Q    Okay.  How far distance were you between

7   each other?

8        A    Quite a little smaller than this.

9        Q    Okay.  Did he say anything other than that?

10        A    About kissing me?

11        Q    Yes.

12        A    I don't know.  He mentioned like that I

13   looked like somebody on TV or something like that.

14   It was just something insignificant.

15        Q    Did you find him to be attractive?

16        A    Yes, he was attractive.

17             MR. COOK:  Just for the record, you said a

18   little bit smaller than this and you patted on this

19   desk.

20             THE WITNESS:  Yeah, probably like this.

21   Just a regular generic kitchen island.  And he was on

22   this side and I was on this side.  So it wasn't like

23   the length of it.  The width of it.

24             MR. COOK:  So like a kitchen table.

25             THE WITNESS:  Yeah.

```
 1        Q     (BY MR. KROGH)   Did you tell him that you
 2   found him attractive?
 3        A     When he was there at my house?
 4        Q     Yes.
 5        A     I don't recall that.
 6        Q     You don't recall it, or you didn't do it?
 7        A     I don't think I said that.
 8        Q     What do you think you said?
 9        A     Normally when somebody compliments or
10   something, I just kind of blow them off, like, yeah,
11   okay, whatever.
12        Q     Okay.
13        A     The flattery stuff is kind of whatever.
14        Q     Okay.  So he was flattering to you and --
15        A     I just kind of blew it off.
16        Q     Okay.  Anything else happen?
17        A     I know we talked about the case.  He said
18   that he was going to come, I guess he was going -- I
19   guess I think he was going to pick up the document.
20   I had to fill it out.  I'm not sure what had to do
21   with the document, whether I had to pick it up or
22   drop it off or whatever.
23        Q     How long was your conversation with him?
24        A     I don't remember.  I don't remember.
25        Q     Half an hour, an hour?  Can you make an
```

```
 1        estimate?
 2             A    I would say guessing maybe like 20 minutes,
 3        20 some minutes.   I'm not really sure.
 4             Q    All right.   And then at that point then did
 5        he leave?
 6             A    Yes.
 7             Q    Okay.   Were you uncomfortable with his
 8        conversation with you?
 9             A    No, he was friendly.   He was nice.
10             Q    Okay.   All right.   No reason to report it;
11        right?
12             A    No.
13             Q    Nothing inappropriate occurred?
14             A    No.
15             Q    Okay.   You weren't sexually assaulted at
16        that point?
17             A    No.
18             Q    Okay.   I just want to make sure I'm getting
19        the right dates and times and episodes.   Okay.   So he
20        had a conversation with you.   He dropped off a
21        statement.   He was flirtatious, charming.   Anything
22        else of significance at that meeting that you can
23        recall?
24             A    No, not really just --
25             Q    When did you start a friendship with him?
```

1    Did you have a friendship with Luke Strommen?

2         A    Pretty much after that.

3         Q    Okay.

4         A    Yeah.  I thought he's law enforcement, I'm

5    law enforcement, seems like a good person, yeah, at

6    least I know somebody.

7         Q    How long of a relationship or friendship did

8    you have with him?

9         A    Not long.

10        Q    Well, two weeks, two months, two years?

11        A    No.  Like a little over two weeks or

12   something like that.  I think it was almost two

13   weeks, somewhere around there.

14        Q    All right.  And how did that, how did that

15   relationship start?

16        A    Just like two cops knowing each other, just

17   like friends.

18        Q    Okay.  Well, you had one meeting with him.

19   At some point then one of you either contacted one

20   another; right?

21        A    Uh-huh.

22        Q    How did that start?

23        A    I know we were corresponding about the case

24   and about what I'm going to do with the follow-up or

25   whatever and the document, and we just kept chatting.

```
 1          Q    When you said corresponding, was it through
 2    text?
 3          A    Yep.
 4          Q    And so you --
 5          A    And phone call.
 6          Q    So through text and phone calls that you
 7    talked to each other about this official report?
 8          A    Correct.
 9          Q    Okay.  Was anything inappropriate about
10    those conversations?
11          A    No.
12          Q    Okay.  All business?
13          A    No.  Just friendship and business, so
14    nothing bad.
15          Q    Okay.  How often do you think you texted one
16    another?
17          A    Not much, not much, but there were like
18    short ones, so.
19          Q    Daily?
20          A    I can't -- I don't even remember.
21          Q    How often did you talk to him?
22          A    I can't really remember.
23          Q    And this is all during a two-week period;
24    correct?
25          A    Correct.
```

1      Q     More than ten times?

2      A     Talking?

3      Q     Yeah.

4      A     I can't really, I can't really remember.

5      Q     Do you remember talking to him more than one

6   time a day?

7      A     Not even that.  I can't remember that.

8      Q     Okay.  How about texting, more than one time

9   a day?

10      A     Wouldn't be able to give you a definite

11   answer on that either.

12      Q     I've read something that there were hundreds

13   of texts between you and Luke, could that be true?

14      A     Could be.  I don't know.  I don't remember

15   how often I texted him.

16      Q     I remember I read somewhere where there was

17   over 400 texts between you and him.  And I'm trying

18   to do the quick math right now, and I'm not that good

19   at that, but that seems to be a lot of texts over the

20   course of 14 days.

21      A     And I'm the person that responds sometimes

22   with one word texts.

23      Q     Okay.

24      A     So I don't like write a huge narrative and

25   send it to somebody.  I'm kind of a one word, so.

1    Q    Who did you contact and when?

2    A    Verizon.

3    Q    All right.  And how did you contact them?

4    A    Through e-mail and phone.

5    Q    So you would have had an e-mail to document

6    that communication; right?

7    A    I think it was e-mail and phone, probably

8    two years ago.

9    Q    Okay.

10   A    I just can't remember.  I can't remember

11   exactly the time.  I can't remember.

12   Q    Did you ever share photos with Luke?

13   A    I don't even remember.

14   Q    Well, during that two-week period of time,

15   would there ever been a reason to share photos of one

16   another with each other?

17   A    I'm not really sure.

18   Q    When you say I'm not really sure, could

19   there be a possibility that you did share photos of

20   yourself with him and he shared them with you?

21   A    Could be.  But to be 100 percent certain,

22   no.  I'm not a selfie-type of person.

23   Q    Okay.  Did your friendship during this

24   two-week period of time ever become romantic?

25   A    Over the phone?

1      Q    At any time.

2      A    Just friendly and flirtatious.

3      Q    What do you mean by flirtatious?  Were you

4    flirtatious with him?

5      A    Just I want to say like giddy and stuff,

6    just being friendly and happy, you know.

7      Q    Were they sexually related or have any kind

8    of sexual connotations to them?

9      A    No.  I wouldn't type anything like that and

10    ask somebody questions like that.

11      Q    At that time, did you want to have a sexual

12    relationship with Luke?

13      A    No.  I wanted to be his friend.

14      Q    Okay.  Do you have a friendship --

15           (Discussion held off the record.  Zoom

16    connection froze.)

17      Q    (BY MR. KROGH)  Did you have a friendship

18    with other married men?  And I think Elena maybe

19    asked me a question in response, meaning like old

20    high school friends or something like that.

21      A    Uh-huh.

22      Q    Do you text married men on a regular basis?

23      A    I do.

24      Q    Okay.  How many?

25      A    They're friends from high school,

1    elementary, and middle school.  Not very often.

2         Q    Okay.  So if we were to compare their level

3    of text to the level of text that you were

4    communicating with Luke, that it would be much

5    greater for Luke, right, if we had 400 texts in a

6    two-week period of time?

7         A    Well, I don't really know because if I do a

8    one word text, you know, that's not very much in

9    texting.

10        Q    Would you agree with me that you texted Luke

11   much more frequently than you text other married men?

12        A    Well, when we are talking to each other and

13   texting, he's a new friend.  He's a new person I

14   know.

15        Q    So you would say yes?

16        A    So I would say yes.

17        Q    Uh-huh.  So apparently then there's another

18   episode where Luke comes to your house; right?

19        A    (Witness nods head.)

20        Q    Is that a yes?

21        A    Yes.

22        Q    Okay.  Was that within this two-week period

23   of time?

24        A    Yes.

25        Q    Okay.  So we're talking about somewhere late

```
 1    December 2014 or early January 2015; right?

 2         A    Correct.

 3         Q    Okay.  What do you recall of the events

 4    leading up to him coming to your house?  Did you call

 5    him?  Did he call you?

 6         A    I don't remember exactly who was who, but I

 7    believe he was coming to talk about the case.  And I

 8    think it was an update, and he was just going to

 9    swing on by.

10         Q    Okay.  So you knew that he was coming to

11    your house?

12         A    (Witness nods head.)

13         Q    Had you, at that point, finished your

14    statement about Mark Tronuer?

15         A    Oh, yes.

16         Q    Okay.  And had you turned it in, or was he

17    coming to get your statement?

18         A    That I don't recall.

19         Q    Okay.  What time of night or day was it?

20         A    Night.

21         Q    Okay.  Do you have any recollection of the

22    exact date or the exact time?

23         A    No, I don't.

24         Q    Okay.  What do you recall that meeting?  So

25    you were anticipating him coming; right?
```

 1          A    Uh-huh.  He came inside the house?

 2          Q    Yeah.

 3          A    It's going to be kind of spotty because I

 4    bottled a lot of it up.  Came into the house, came

 5    into my side door into my kitchen, the way he came

 6    the first time.  And then we were talking and just

 7    like friends, we were just talking.  And then he

 8    decides to hug me and grab me and aggressively and

 9    starts kissing me.  And then I remember he takes his

10    gun belt off, and he's getting comfortable.  And then

11    I remember his shirts came off.  I think he had two

12    shirts.  I'm not really sure.  I think -- and, and I

13    know it's kind of messy because I can't remember

14    everything exactly.  But he ends up basically taking

15    me into one of my rooms and showing off and being a

16    braggart and --

17          Q    What room did he take you into?

18          A    The room on the north side of my house.

19          Q    Okay.  Is it a bedroom?

20          A    Yes.  I have, I had three-bedroom I think,

21    two or three-bedroom.  I can't remember.

22          Q    Okay.

23          A    And he starts just bragging about himself

24    what he would do with me if we were in a

25    relationship.  And I remember he was laying on my

1   bed.  And kind of like performing acts how he would

2   have sex with me and what he would do to me.  And

3   then he got up, and I was on by the wall in my room.

4   And he got up and grabbed me, started showing me what

5   he would do to me, if we were in a relationship.

6           Q    Okay.  Was he --

7           A    Very aggressive.

8           Q    When you say he was showing you, was he

9   mimicking sexual acts to you?

10          A    Yes.

11          Q    Okay.  All right.

12          A    And then --

13          Q    And you had your clothes on; right?

14          A    Yes, yes.

15          Q    Okay.  And he had his shirts off, but his

16  pants on?

17          A    Correct.

18          Q    Okay.  And you were standing by the wall and

19  he grabbed you, okay.

20          A    (Witness nods head.)  And he was

21  aggressively pushing me up against the wall.  And

22  then some point in time we moved around my bed area,

23  and I got away from that area.  And he came around to

24  me and put one of his hands in the back of my pants.

25          Q    Okay.

1          A    And I told him I didn't want that.   I told

2     him to stop multiple times.   And he kept shoving his

3     hand down the back of my pants.   And he's a big guy,

4     solid guy, works out, you can tell.   And I thought to

5     myself the only thing that I can do to stop this from

6     happening is to put all of my weight on my rear end

7     and just sit down on the ground.   And maybe I can

8     make him stop that way, and he didn't.   It didn't, it

9     didn't work.   He was able to -- I remember me putting

10    my hand behind my back trying to grab him to stop him

11    from putting his hand further into my pants.

12          Q    Huh.

13          A    And then he managed to stick one of his

14    fingers in my vagina, very aggressively.   And then he

15    pulled his hand out.   And I recall that he sat in

16    front of my bed.   And I got up, I think I got up off

17    the floor.   And he told me, I recall he looked at me

18    directly in my eyes, and he got the hand that he had

19    and the finger, and he put the finger all the way

20    into his mouth.   And then he pulled it out like a

21    lollypop, and he said something like it tastes really

22    good or something like that.

23          Q    Okay.

24               MR. COOK:   Are you doing all right?

25               THE WITNESS:   (Witness shakes head.)

```
 1        Q    Why did you dismiss Luke Strommen?

 2             MR. COOK:   You don't have to reveal any

 3   client communications that you or I had.

 4        A    I don't know.   I don't have the answer to

 5   that.

 6        Q    (BY MR. KROGH)   Well, there must have been a

 7   basis that you came to a conclusion that you were

 8   going to dismiss Luke Strommen from any kind of

 9   liability relating to the events that you've just

10   testified to; right?

11        A    I don't know how to answer that.

12        Q    Well, you'll acknowledge that you initially

13   named Luke Strommen in this lawsuit; right?

14        A    Correct.

15        Q    And you know and you intentionally did so

16   because you thought he was responsible for acts that

17   you've just described to me; right?

18        A    Correct.

19        Q    And subsequently you have dismissed him from

20   this lawsuit releasing him from all liability for any

21   claims that you are asserting in this case.   Do you

22   understand that?

23        A    Yes.

24        Q    Okay.   And my question to you is why.   Why

25   would you voluntarily dismiss the person who you just
```

```
 1      testified sexually assaulted you?
 2           A    I don't know how to answer that.
 3           Q    Well, Ms. Salinas, I guess how many
 4      lawsuits -- you've not been in a lot of lawsuits in
 5      your life; right?
 6           A    No.
 7           Q    This is an important thing; correct?
 8           A    Correct.
 9           Q    You've named a person who you believe was
10      the assaulter, that committed a crime on you; right?
11           A    Yes.
12           Q    And now you've dismissed him from this
13      lawsuit; right?  And sitting here today you have no
14      explanation to me why you would release the sole
15      person who committed a crime against you?
16           A    I don't know how to answer that.
17           Q    So you don't know how to answer it, or you
18      don't have an answer for me?
19           A    Because I don't have an answer for you.
20           Q    At some point you contacted Valley County
21      Sheriff's Office about this incident; right?
22           A    Yes.
23           Q    Okay.  And that was in January 2015; right?
24           A    Yes.
25           Q    Okay.  And you called and spoke with Glen
```

1    Meier, the sheriff; right?

2         A    Yes.

3         Q    You had a conversation with him?

4         A    Yes.

5         Q    And the conversation was you wanted to tell

6    Glen Meier that you were uncomfortable with one of

7    his deputies; right?

8         A    Yes.

9         Q    And that was kind of your words, you were

10   uncomfortable; right?

11        A    Yes.

12        Q    And you didn't initially identify Luke;

13   right?  He had to ask you who it was; right?

14        A    I don't remember that.

15        Q    Okay.  What do you remember about the call

16   to Glen Meier?

17        A    That I called him, and I was on the speaker

18   phone.  And other people were in the room, and it was

19   the sheriff and undersheriff.

20        Q    Vern Buerkle; right?

21        A    Uh-huh.

22        Q    You recall that conversation; right?

23        A    Uh-huh.

24        Q    And they asked you about this incident;

25   right?

```
 1        A    Uh-huh.
 2        Q    And, in fact, you told them I just want him
 3   to stay away from me; right?
 4        A    Yes.
 5        Q    That's what you told them?
 6        A    Yes.
 7        Q    You didn't tell them that you were sexually
 8   assaulted; right?
 9        A    I didn't want to go that far on speaker
10   phone.
11        Q    You didn't tell them that you were sexually
12   assaulted; right?
13        A    I told them that something really bad had
14   happened.
15        Q    You didn't describe the events that you just
16   described to me, that Mr. Strommen digitally
17   penetrated you with his finger; right?
18        A    No.
19        Q    You didn't?
20        A    (Witness shakes head.)
21        Q    Okay.  In fact, you told them all you wanted
22   him to do is to stay away from you and your property;
23   right?
24        A    Correct.
25        Q    Correct is your answer; right?
```

1  A Uh-huh.

2  Q You didn't use the word rape; right?

3  A No.

4  Q You didn't describe it as a sexual assault;

5 right?

6  A No.

7  Q In fact, you didn't even want him to lose

8 his job; right?

9  A I told them do whatever they need to do,

10 just keep him away from me.

11  Q Right.  You didn't even want him to lose his

12 job; right?

13  A I didn't, I didn't even think about what he

14 had did to me.

15  Q My question is you told them I don't even

16 want him to lose his job; right?

17  A No, because I'm a nice person.

18  Q So your answer is correct, I am correct in

19 that that is exactly what you told Vern?

20  A Yes.

21  Q And that's exactly what you told Glen;

22 right?

23  A Yes.

24  Q And didn't, in fact, they asked you to come

25 in and file a statement because they wanted to know

1    the details, every detail of your complaint; right?

2        A    And I was terrified to go down there, so I

3    didn't want to go down there.

4        Q    Right.  And you made no other arrangements

5    to file a complaint or get any kind of assistance to

6    do so; right?

7        A    No.

8        Q    You never followed up with them; right?

9        A    Once I reported it, I didn't want to keep

10   prying on them about it because I didn't want him to

11   come and retaliate against me.

12       Q    You didn't have any expectation that they

13   were going to conduct an investigation because you

14   didn't give them enough information about it, did

15   you; right?

16       A    When I told them that he had did something

17   really bad to me, my tone changed and they knew

18   something was really wrong.

19       Q    So is it your testimony that they should

20   have perceived by the tone of your voice and the

21   choice of your words that something bad happened,

22   that that was a sexual assault?

23       A    I would say yes.

24       Q    Okay.

25       A    And also when I was talking to the

1    investigators, Bruce McDermott, quite frankly, I
2    didn't even think that penetration with the finger is
3    rape until McDermott told me that it was.
4        Q    Well, let's -- now that you mention Bruce
5    McDermott, I do have the telephone interview of
6    June 6th of 2018 from you with Mr. McDermott.
7             And I don't have a copy of it, Counsel.
8             MR. COOK:  Yeah.
9             MR. KROGH:  I didn't anticipate making it an
10   exhibit, I don't really want to make it an exhibit,
11   but if you want to grab that.
12            MR. COOK:  Yeah, I can do that.
13            MR. KROGH:  And I don't mind you sharing it
14   with your client.  And, Katie, for the record, we're
15   at MC 18601, and then all the way through I think
16   they're Bates stamped 319 through 342?
17            MR. COOK:  Which one are you looking at?
18            MR. KROGH:  I'm looking at this one right
19   here.
20            MR. COOK:  June 6th, two phone calls.
21            MR. KROGH:  Right.
22            MR. COOK:  316.
23            MR. KROGH:  Let's go to 321.
24        Q    (BY MR. KROGH)  Ms. Salinas, would you just
25   look on 321 there on the top, there's initials BM,

1   which is Bruce McDermott, and then ES is you; right?

2       A    Yes.

3       Q    And then on the second line you said, "Um,

4   well, I know I talked to the sheriff's office and

5   reported it."

6            And Bruce says, "Uh-Huh."

7            And you say, "And I talked to them over the

8   phone, and I told them to just to keep him away from

9   me.  I didn't want him near me."

10           Do you see that?

11      A    Yes.

12      Q    And that's what you told them, didn't you?

13      A    Yes.

14      Q    And then on the page, 342, if you can turn,

15  there's a reference to Glen Meier there on the fourth

16  line.  Do you see that?

17      A    Uh-huh.

18      Q    And Bruce McDermott says, "And, and all you

19  wanted to do is to have him keep the officer away?"

20           And you said, "Just have him, yeah, I wanted

21  him to stay away from my property, stay away from me,

22  and leave me alone."

23           And Bruce McDermott said, "Who is the

24  officer?"

25           And you said, "Strommen, the last name

```
 1          Strommen, and you spell it."
 2                    And he says, "Yeah, is it Luke?"
 3                    And you said yes.
 4                    So you reported to Bruce McDermott exactly
 5     what you reported to Vern and Glen; right?
 6          A    Uh-huh.
 7          Q    And as a federal officer for 16 years --
 8          A    Yes.
 9          Q    Weren't you 16 years?  You understand the
10     importance of a written statement, don't you?
11          A    Correct.
12          Q    And you understand that a written statement
13     then details the exact nature of the allegations
14     against someone; right?
15          A    Correct.
16          Q    And being a deputy officer right now, you
17     know that a complaint against a law enforcement is a
18     very serious allegation; right?
19          A    Yes.
20          Q    One that cannot be taken without serious
21     thought and consideration and ramifications; right?
22          A    Yes.
23          Q    And you understood how important it would be
24     if you wanted to actually report this about Luke,
25     that you would describe in detail, much like you did
```

1    with me today, the events that occurred at your

2    house; right?

3         A    Correct.

4         Q    But you didn't do that, did you?

5         A    I didn't want to do that over speaker phone,

6    and I figured they would follow up and do something.

7         Q    And you didn't do it on a written statement

8    either; right?

9         A    No.

10        Q    And you also understand that in fairness to

11   the officer, a written statement is the only way that

12   an officer can defend him or herself against a false

13   accusation; right?

14        A    Correct.

15        Q    And you never gave Luke Strommen the

16   opportunity to defend himself against you because you

17   never provided a written statement describing in

18   detail what had happened; right?

19        A    I wanted them to take care of it in-house.

20   And if they called me to follow up, I would go talk

21   to them.

22        Q    But you never provided them with a detailed

23   description of what you just testified to me; right?

24        A    Correct.

25        Q    And at some point in your conversation with

1    with the sheriff, the undersheriff, knew them by

2    name; right?

3         A    Just by name, but never saw them until after

4    the fact.

5         Q    You called the sheriff's office 24 times in

6    a matter of five years on everything, cows out,

7    smoke, neighbors, restraining orders, things at work,

8    credit card fraud.  You called them all the time;

9    right?

10        A    (Witness nods head.)

11        Q    You had confidence in them as a law

12   enforcement agency; right?

13        A    Correct.

14        Q    And now you're telling me that you were

15   afraid to go to the Valley County Sheriff's Office

16   because of Luke Strommen; is that your testimony?

17        A    Yes.

18        Q    Okay.  You weren't, you weren't threatened

19   by Glen, were you?

20        A    No.

21        Q    You weren't threatened by Vern, were you?

22        A    No.

23        Q    You knew the other officers, right, Estevez;

24   right?

25        A    Just by --

```
 1          Q     Remmich; right?

 2          A     I don't remember that name.

 3          Q     Any other officers that you knew or deputies

 4     that you knew?

 5          A     Not where -- I couldn't point them out to

 6     you.

 7          Q     How about Chris Richter?

 8          A     That doesn't sound familiar.  I don't

 9     remember the name.

10          Q     Okay.  At some point your relationship then

11     with Luke Strommen ended.  And you say it ended after

12     that second meeting with him; right?

13          A     No.

14          Q     Okay.  It didn't.  You continue to

15     communicate with him?

16          A     Yes, I didn't want to piss him off.

17          Q     Did you tell him that, that you were

18     communicating with him just because you didn't want

19     to piss him off?

20          A     No.

21          Q     Okay.  Would he have been led to believe

22     that you were still interested in him --

23          A     No.

24          Q     -- by communicating with him?

25          A     No, he was interested in him.
```

1      Q    So did you continue to text with him?

2      A    Yes.

3      Q    Call him?

4      A    Talked to him, yes.

5      Q    What about?

6      A    Just whatever he want --

7      Q    When did that end?

8      A    His wife contacted me like at 2:00 or 3:00

9    in the morning one night, woke me up, and was yelling

10   and angry.  And apparently he had told her, but he

11   had not told her the truth because she wouldn't be

12   yelling at me if she knew the truth.  And I told her

13   you need to talk to him about it.  I'm not going to

14   say anything.  I told her just keep your man on a

15   leash.  He's the one that came out to my house.  I

16   didn't go seeking him.  And I calmed her down.  We

17   got off the phone.  I think she hung up with me.

18   After that phone call, it was not days or weeks or

19   anything, but after that phone call, that's when I

20   called the sheriff and undersheriff and what was

21   happening and that the wife contacted me and

22   everything, and that it was done.  And I never ever

23   spoke to him ever again.

24      Q    Did you have any other conversations with,

25   is it Tara Strommen?

1      right?

2           A     Correct.

3           Q     And I'm not suggesting that you're

4      consenting to any kind of crime, Ms. Salinas, okay.

5           A     (Witness nods head.)

6           Q     But I guess I'm trying to get a

7      clarification in terms of the nature of your

8      allegations.  And when I read sexual abuse, I

9      generally refer to that as an episode where a child

10     is being forcibly engaging in a sexual activity with

11     an adult, right, you understand that?

12          A     Okay.

13          Q     And that is not the case here; right?

14          A     This was drafted by my attorney.

15          Q     Okay.  All right.  There is also some

16     allegations in your complaint that after you reported

17     this, that Luke Strommen then was around you or that

18     he somehow had some kind of contact with you.  And

19     I'll show you the allegation.  It's on Page 3 of your

20     Third Amended Complaint under Paragraph Roman Numeral

21     X or 10.  And you talk about following your report,

22     Elena Salinas continued to have unsupervised

23     association with Luke Strommen.  Do you see that?

24          A     Uh-huh.

25          Q     What do you mean by unsupervised

```
 1    association?
 2         A    This was drafted by my attorney as well.
 3         Q    Okay.  Do you have any personal knowledge of
 4    him having unsupervised association with you?
 5         A    He was parking outside of my house --
 6         Q    Okay.
 7         A    -- during Stonegarden.
 8         Q    And what is Stonegarden?
 9         A    It's money allocated from the government
10    from FEMA that you can apply for a grant, and they
11    give money to counties, so they don't have to spend
12    that much money patrolling.  But they will give you a
13    certain amount, and then they pay the officers that
14    amount of money.  Instead of paying border patrol
15    higher salary hourly rate, they would rather give
16    money to the county, so they can help out.
17         Q    And you're saying that at some times he was
18    patrolling in your neighborhood?
19         A    Correct.
20         Q    Okay.  And you found that to be wrong,
21    because he was --
22         A    Disturbing and harassing to me.  And when he
23    was around those areas, it was --
24         Q    Well, I guess I want to try to get to the
25    nature of this.  Is how often was he patrolling in
```

```
 1      your neighborhood?
 2            A     Roughly from like when the situation
 3      occurred to about a couple of years, whatever, maybe
 4      about four or five times.
 5            Q     And when you mean patrolling, was he in his
 6      vehicle?
 7            A     Yes.
 8            Q     And he was driving around?
 9            A     Uh-huh.
10            Q     Driving on streets?
11            A     Uh-huh, and then parking.
12            Q     Parking on streets?
13            A     Stationary, yes.
14            Q     Okay.  And what evidence do you know that he
15      wasn't authorized to be in that area?
16            A     I don't have any.
17            Q     Okay.  What evidence do you have to suggest
18      that he was doing that to intimidate you?
19            A     Sometimes he would look directly at me.
20            Q     I understand that.
21            A     And I would see him in the window, and I
22      would freak out.  And I would just get down on the
23      ground and hide.
24            Q     How far away was he parked from your house?
25            A     On the cul-de-sac, it would be like, I don't
```

1    know, 20, 20 feet from my window, my front door, or
2    in the backyard it would probably be 25, 30 feet.
3         Q    Can you tell me how many times he did this?
4         A    Maybe like about almost five times, roughly
5    there.
6         Q    And can you tell me when he did it?
7         A    No.
8         Q    You don't have any recollection of what the
9    dates were?
10        A    No.
11        Q    You don't have any documentation of it?
12        A    Huh-uh.
13        Q    You don't have anyone that witnessed this?
14        A    Not that I know of.  Nobody told me.
15        Q    You didn't call 911 at any time and ask why
16   Luke was parked near your house?
17        A    I didn't want to, I didn't want to contact
18   him and add more fuel to the fire because I was very
19   afraid of him doing his job and stopping me when I go
20   get groceries.  That's where I went shopping.  That's
21   where I went and got groceries.  That's the only safe
22   place I had to go to.
23        Q    And so it sounds like you were terrified?
24        A    I was.
25        Q    And you knew it was very serious.  So what

```
 1    did the city of Glasgow say when you called them?

 2         A    What do you mean?

 3         Q    Well, didn't you call the city police on

 4    Luke Strommen?

 5         A    No.  Like I said, I didn't want to continue

 6    to put fuel in the fire.  I didn't want him to come

 7    after me.

 8         Q    Well, didn't you call the FBI being a

 9    federal agent?

10         A    We usually don't talk to the FBI, not even

11    on a yearly basis.

12         Q    Didn't you call anybody?  You're telling me

13    you were scared to the point that you had to lay down

14    and were terrified, but you called nobody to protect

15    yourself?

16         A    Yep.

17         Q    Okay.

18         A    So I just changed my life for him.

19         Q    And there's no one that I can talk to that

20    would have witnessed one of these five episodes or

21    were with you at the time?

22              MR. COOK:  I believe she testified that Luke

23    was also a party, so he would have knowledge.

24         Q    (BY MR. KROGH)  Okay.  But beyond Luke, is

25    there anybody that you can point me to that would
```

```
 1    confirm your testimony today?

 2         A    Maybe Shawn can.  I think he saw him one

 3    time.

 4         Q    And what he saw was Luke being parked on a

 5    city street or on a roadway --

 6         A    Uh-huh.

 7         Q    -- right?  For how long?

 8         A    I can't really give you specifics because

 9    when that happened, if I was in my bedroom or

10    watching TV, and I noticed lights and I noticed that

11    he was there, I was like, oh, crap.  So I shut

12    everything down, and I would just get out of there

13    and go somewhere else in the house.  And I would go

14    in the basement and stay in the basement.  And

15    sometimes I would just sit there for hours and go

16    back and check.

17         Q    So you don't know whether he was there for

18    20 seconds or for two hours?

19         A    No.

20         Q    You can't say?

21         A    I've seen it before where he was there for

22    longer, you know.  I would say longer than an hour at

23    certain times.  But nothing that I documented or

24    wrote down because I just wanted to make it go away.

25         Q    Did he ever try to contact you?
```

1      A    No.
2      Q    Did he ever try to approach you?
3      A    No.
4      Q    Was he trespassing?
5      A    No.
6      Q    Do you know if he was on duty on those
7   times?
8      A    Yes.
9      Q    How do you know that?
10     A    His vehicle.
11     Q    Well, can't law enforcement officers take
12   vehicles home with them?
13     A    I'm not sure about the protocol of Valley
14   County.
15     Q    Yeah, so you don't know?
16     A    No.
17     Q    So sitting here today, you don't really know
18   whether he was on duty or not; right?
19     A    You can't do Stonegardening without a
20   uniform.
21     Q    Well, how do you know that he was doing
22   Stonegarden?
23     A    I would hope he was.
24     Q    You're assuming that, aren't you?
25     A    Yes, but I'm hoping he is.

1      Q    But sitting here today, do you have any

2    evidence that he was working during those times?

3      A    No.

4      Q    So he could have been on his personal days

5    off, he could have been in between shifts; right?

6      A    Could be.

7      Q    Okay.  Do you have any information that you

8    can share with me that he was not authorized to be at

9    that location at that time, if he was working?

10      A    No.  I wouldn't be privy to that

11    information.

12      Q    And you have not looked for it either, have

13    you?

14      A    It would be, I don't know what I would even

15    do to get that information.

16      Q    You've also made an allegation that he's

17    passed you in close proximity to you at times.  Tell

18    me about that.

19      A    That was in the courthouse.  I was doing

20    some paperwork with Shawn.  And waiting at the lobby

21    counter like in the basement talking to a lady there.

22      Q    In the basement of the courthouse?

23      A    Uh-huh.

24      Q    Which is where the sheriff's office is at.

25      A    I think so.  But the documentation that we

```
 1    needed to have was from a certain lady at her office,
 2    which was right there in the breezeway-type of thing.
 3    And I'm standing there, and Shawn is standing there.
 4    And I'm looking this direction, and he comes right
 5    out and starts walking towards me and stares right at
 6    me, and I look at him.  And once I look at him, I
 7    just can't think of what I'm thinking about and what
 8    I'm doing.  So I started panicking, and he just
 9    walked past.  And I turned around and made sure he
10    left the area, and he was gone.
11         Q    Did he try to talk to you?
12         A    No.
13         Q    Did he touch you?
14         A    No.
15         Q    Did he do anything other than walk by you in
16    the courthouse?
17         A    And look at me.
18         Q    And look at you?
19         A    No.
20         Q    Okay.  And that happened one time?
21         A    Yes.
22         Q    Okay.  And do you remember when it happened?
23         A    It was, I think it was roughly in 2018, we
24    were filling out paperwork.  I believe it was -- I'm
25    not sure if it was for our marriage paperwork or for
```

```
 1     bottom there, it's under Paragraph XXIII, it starts

 2     on that page, but then it goes to the next page, and

 3     on the next page it talks about when he passed in

 4     close proximity to you unsupervised in March of 2020.

 5     Do you see that?

 6              Do you have any knowledge about passing in

 7     close proximity with Luke Strommen in March of 2020?

 8              MR. COOK:  I believe she testified to that.

 9        Q    (BY MR. KROGH)  Okay.  Is that the one in

10     the courthouse, is that what you're thinking?  I

11     thought you said it was in '18.

12        A    It was in '18.  That must be a mistake.

13              MR. COOK:  Oh, my mistake.

14        A    Yeah, I was gone in '19.

15        Q    (BY MR. KROGH)  Okay.

16        A    Sorry.

17        Q    Ms. Salinas, you've alleged a number of

18     different kinds of damages in this case, and so I'm

19     going to try to talk and clarify some of those

20     possible damages that you are now seeking.  In your

21     pleadings you've asked for past and future medical

22     expenses.  I'm not aware that you've ever sought

23     medical treatment for anything that you've just

24     testified to this morning.  Have you sought medical

25     treatment as a result of the incident that you
```

1    testified to about Luke Strommen?

2          A    No.

3          Q    Okay.

4          A    I talked to my doctor, and I told her what

5    happened.

6          Q    But you've not sought any specific treatment

7    with a medical provider and incurred medical bills

8    because of it; right?

9          A    I don't think so.

10         Q    Okay.  Are you currently treating with

11   someone about a condition that you believe was caused

12   by the events that you've testified to?  Are you in

13   counseling?

14         A    I'm in counseling.

15         Q    Okay.  When did you begin counseling?

16         A    About a month ago.

17         Q    A month ago?

18         A    A month ago.

19         Q    Okay.  And who is your counselor?

20         A    Lorea, L-O-R-E-A, Watson, I believe, from

21   the Village in Minot.

22         Q    And how many times have you visited with

23   her?

24         A    Be like three or four times maybe.

25         Q    Okay.

```
 1          A    Because I've been pretty sick for a while,

 2    and I've been zooming and doing different methods to

 3    do that.

 4          Q    Has she made a diagnosis of you?

 5          A    No.

 6          Q    Okay.  Have you filled out any intake papers

 7    and given a history to her?

 8          A    Yes.

 9          MR. KROGH:  Okay.  I would ask that you

10    provide that with your next response there, Counsel.

11          MR. COOK:  Yeah.  We've requested that, so I

12    will supplement that as soon as I get it.

13          Q    (BY MR. KROGH)  Okay.  Ms. Salinas, have you

14    had counseling before?

15          A    Uh-huh.

16          Q    When was the first time that you engaged in

17    counseling?

18          A    Like my whole life?

19          Q    Yeah.

20          A    When I was a child.

21          Q    Okay.

22          A    My dad was an alcoholic.

23          Q    Okay.  And when you mean a child, elementary

24    age?

25          A    Yes.
```

```
 1          Q    How many different counselors did you see?

 2          A    At school or outside of school like hiring

 3     somebody?

 4          Q    Like hiring somebody.

 5          A    Oh, pretty much I've never hired anybody.

 6     The EAP was free with work.

 7          Q    Uh-huh.

 8          A    And then the EAP is free at my work right

 9     now, so.

10          Q    Are you engaged with EAP with your work

11     right now?

12          A    Well, that's Lorea Watson, yes.

13          Q    Okay.

14          A    But I'm sure that Strommen was brought up in

15     EAP in my career.

16          Q    And you can request those documents, can

17     you?

18          A    Yeah, I guess, yeah, I guess I can from EAP.

19     Maybe they won't be that difficult, maybe, since

20     they're kind of a separate third-party.

21          Q    If you have control of those, I request that

22     you do so.

23          A    Okay.

24          Q    Are you contending that you are suffering

25     from emotional distress at this point because of the
```

1          incident with Luke Strommen?

2                A     I have -- I do have some problems when it

3     comes to, just like yesterday driving here, when I

4     saw the Valley County sign.

5                Q     Okay.  Tell me about your symptoms.  Do they

6     come and go?  Are they constant?

7                A     When I saw the Valley County sign, it's

8     difficult for me to come here.  Difficult for me to

9     come to a place where I don't want to be.  I don't

10    want to be here again.  I don't ever want to come

11    back my whole life.  When I left last night to go get

12    some dinner, I parked in front of the courthouse.  I

13    was at the stop sign in front of the courthouse is

14    what I meant, and it kind of startled me.  I kind of

15    lost my breath a little bit because that's where he

16    worked.  I was just hurrying and trying to get my

17    stuff together and get to the hotel room because I

18    don't want to be out and about in Glasgow.  I'm not

19    comfortable here.  I don't want to be here.

20                Q     I understand that you had that episode last

21    night.  What was the most recent episode prior to

22    that time that you had?

23                A     Preparing to come here.

24                Q     Yeah.

25                A     Preparing to come here.

```
 1          Q    Okay.  What did you do in preparation for

 2     this deposition today?

 3          A    What do you mean.

 4          Q    Well, what did you do to prepare yourself

 5     for this deposition?  Did you review any documents?

 6          A    Of course I did.

 7          Q    What documents did you review?

 8          A    Just my interview and the phone call from

 9     Bruce because it's been such a long time.

10          Q    Did you have any difficulty with that

11     emotionally?

12          A    Yes.

13          Q    Okay.  Would you say your symptoms are

14     isolated in the sense that when you think about

15     things like this, that's when you feel the emotion?

16          A    (Witness nods head.)

17          Q    Would that be a fair thing to say?

18          A    Correct.

19          Q    Is it something that is constant or

20     intermittent?

21          A    Intermittent.

22          Q    Is it daily?

23          A    No.

24          Q    Okay.  Is it monthly?

25          A    It depends if I think about it.
```

```
 1          Q    Okay.  Have you lost any work recently
 2    because of it?  Have you taken any time off?  Have
 3    you asked for a leave of absence?
 4          A    I have been sick, and I have been taking
 5    time off.
 6          Q    What do you mean by sick?
 7          A    I got injured at work.
 8          Q    Okay.
 9          A    And --
10          Q    I'm talking about emotionally you're not
11    able to go to work because of the events that you
12    described to me with Luke Strommen.  Are you taking
13    time off because of those, or are you taking time off
14    because you're stick or --
15          A    I'm taking time off because I'm sick.  But
16    if I do think about it or I see something that
17    reminds me of him or a Valley County sign or Glasgow
18    or anything regarding Glasgow or the sheriff's office
19    here.
20          Q    Right.  But sitting here today, you have not
21    made a request for time off because of your emotional
22    well-being relating solely to Luke Strommen; right?
23          A    I've only been upset about it when I think
24    about it.
25          Q    Okay.  You've also alleged that you have a
```

```
 1      loss of established course of life, and that
 2      generally means you've changed something in your life
 3      or you don't do things in your life that you used to.
 4      Can you -- is there anything in your life that you
 5      don't do now that you did before because of your
 6      episode with Luke Strommen?
 7           A    Trust police officers as much anymore.
 8           Q    Okay.  Is that an overall distrust of police
 9      officers or just certain ones?
10           A    I'm more cautious now.
11           Q    Okay.  The last time that we have record of
12      you calling Valley County was in 2020.  Have you
13      called 911 Valley County since then, do you know?
14           A    Probably not.
15           Q    Okay.  Have you called other police officers
16      since 2020?
17           A    Probably not.
18           Q    Okay.  You're a police officer now or a
19      deputy; right?
20           A    Yeah, but I'm in the office, so.
21           Q    You have a trust in law enforcement officers
22      being one; right?
23           A    Correct.
24           Q    When did your fear or distrust of law
25      enforcement start?
```